UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

IN RE:

TIMOTHY J. KILLGROVE,                                          Case No. 11-62528
                                                                Chapter 7
      Debtor.                                           Hon. Walter Shapero
_____/

BANK OF AMERICA, NA, a national
banking association, successor by merger                       Adv. Pro. No. 11-06687
and acquisition to MBNA AMERICA
(DELAWARE), NA, and successor by merger
to BANC OF AMERICA PRACTICE
SOLUTIONS, INC., a foreign corporation,

      Plaintiff,

v.

TIMOTHY J. KILLGROVE,

      Defendant.
_____/

## OPINION REGARDING PLAINTIFF'S ACTION FOR DENIAL OF DISCHARGE AND NONDISCHARGEABILITY OF DEBT

### INTRODUCTION

    The debtor, a dentist, entered into a finance agreement with a bank and granted it a blanket

security interest in all his practice's assets, including goodwill, patient files, and general

intangibles.  The bank alleges that the dentist violated the agreement by closing the practice at its

location, becoming employed as a dentist at a nearby practice, and treating patients of his former

practice there, and that he should be denied discharge under several counts of 11 U.S.C. § 523

and § 727.  The bank's request for relief is denied in its entirety.

1

## <u>Background</u>

Dr. Timothy J. Killgrove ("Defendant") is a licensed dentist and the debtor in this matter. In 1996, Defendant purchased the assets of a dental practice and operated it as Timothy J. Killgrove, D.D.S., P.C., Family & Cosmetic Dentistry ("Killgrove PC"). Defendant's purchase professed to include all of that practice's assets, including the goodwill, phone number, general intangibles, and patient files, records, and fees. Defendant originally operated the practice in Farmington Hills, Michigan until 2002, when he moved it to nearby Novi, Michigan. Throughout the relevant period, Defendant was the only dentist working at Killgrove PC, as well as its sole shareholder and officer. In May 2007, Killgrove PC entered into a Finance Agreement with Bank of America ("Plaintiff"), the salient provisions of which included: (a) Defendant's personal guarantee of the loan; (b) a principal loan sum of about $367,710.42; (c) Plaintiff having a blanket lien on all the assets of Killgrove PC; and (d) a warranty that Defendant shall not relocate the collateral without prior notice to, and consent of, Plaintiff. The perfected Finance Agreement states in relevant part:

> 8. **Representations and Warranties.** Borrower [Killgrove PC] and any Guarantor, when applicable, represent, warrant, covenant and agree that at all times: (a) the Collateral shall be kept at the location specified in Box 2 above and in any other location at which Borrower maintains a practice; (b) Borrower shall promptly notify Lender of any change in the location of the Collateral, and Borrower shall not remove the Collateral from said location without the prior written consent of Lender, except for Inventory sold in the ordinary course of business… (e) except for sales of Inventory in the order course of business, Borrower will not sell, exchange, lease or otherwise dispose of any interest in the Collateral without the prior written consent of Lender and shall not, without the written consent of Lender, permit any lien, security interest or encumbrance to attach to the Collateral.
>
> ***
>
> 18. **Events of Default.** The following shall be events of default hereunder… (a) failure to make any payment of the Indebtedness and, except for the failure to pay

2

at maturity, such failure continues for 10 days after it first became due; (b) Borrower or any Guarantor defaults in the performance of any of their obligations or breaches any representation, covenant, or warranty under this Agreement, under any of the other Loan Documents, or any other agreement with Lender or any affiliate of Lender… (d) the loss, theft, destruction, sale, assignment or unpermitted encumbrance of or on any Collateral… (f) Borrower or any Guarantor dies, stops doing business as a going concern, merges, consolidates, transfers all or substantially all of its assets to a third party or undergoes a substantial deterioration of financial condition[.]

19. **Remedies on Default.** Upon the occurrence of any Event of Default, Lender may at its option, exercise one or more of the following remedies without notice or demand against each Borrower and each Guarantor, except as required by law… (iv) exercise all of Lender's rights and remedies as a secured party, including the right to enter any premises where the Collateral may be located without legal process and take possession of and remove the Collateral which, upon request of Lender, Borrower agrees to assemble and to make available at a place designated by Lender; (v) sell, lease or otherwise depose of any Collateral of Security at public or private sale and collect any deficiency balance with or without resorting to legal process; (vi) require Borrower to assign and transfer custody of its patient medical and/or dental files, records, charts and/or lists to a duly licensed medical, dental or other health care practitioner selected by Lender in its sole discretion, to execute such documents as Lender deems necessary to effect such assignment and transfer, and to turn over and remit to Lender the proceeds from any transfer or assignment for value; or (vii) exercise any other right or remedy available to Lender at law or in equity, including without limitation, the right of set-off...

\*\*\*

42. **Definitions.** As used in this Agreement, the capitalized terms set forth below shall have the following meanings… *"Collateral"* means all of the business personal property and business assets of Borrower, and if any applicable, any Guarantor, wherever located, and now owned or hereafter acquired, including without limitation: (i) Accounts, including health care receivables… (iv) Equipment… (x) General intangibles, including payment of intangibles, goodwill, licenses, intellectual property and tax returns… The term "Collateral" further includes all Borrower's, or if applicable, all of Guarantor's, right, title and interest in and to all patient lists, files and records, and books, records and data relating to the Collateral identified above, regardless of the form of media containing such information or data, and all software necessary or desirable to use any of the Collateral identified above or to access, retrieve or process any of such information or data. Where the Collateral is in possession of the Lender or the Lender's agent, the Borrower, or if applicable, Guarantor, agrees to deliver to

3

Lender any property that represents an increase in the Collateral or the profits or proceeds of the Collateral.

Trial Ex. 1.

Beginning around 2009, Killgrove PC's financial condition began declining because the worsening economy resulted in fewer people carrying dental insurance and a decreased demand for dental services. This decline in demand was especially pronounced for Killgrove PC because it provided cosmetic dental services, which were mostly elective and only partially covered by some dental insurance plans, and did not require ongoing treatment after the completion of the restorative services. Defendant and/or Killgrove PC were also being sued by multiple dental laboratories for nonpayment for goods and services rendered and struggled to make payments to Plaintiff on a separate unsecured line of credit. The leased premises in which Killgrove PC operated had a monthly rent of around $9,669, with respect to which Defendant repeatedly, but unsuccessfully, attempted to negotiate a reduction. Killgrove PC was behind on both state and federal taxes and was being charged sizeable late fees by Plaintiff. Defendant took various measures to reduce its expenses, but little, if any, relief resulted from these efforts. Defendant informed Plaintiff of Killgrove PC's dire financial condition and asked for some sort of relief, though apparently he did not explicitly ask for a loan modification nor apparently did he explore the option of having Killgrove PC file a Chapter 11 bankruptcy. Around April 2011, Defendant stopped making payments to Plaintiff under the Finance Agreement.

Defendant's personal finances also suffered. He testified he was ten months behind on his home mortgage payments, behind on his home property taxes, threatened with utility shut-offs, behind on his vehicle payments, and unable to maintain health insurance for himself or his wife

4

and three children.  To supplement his personal income, he took a part-time associate dentist position with another practice, requiring him to drive about 90 minutes each way.

In the fall of 2010, Defendant met with a broker who dealt in dental practices about possibly selling Killgrove PC's practice, but was informed it was not saleable.  Defendant testified that it was his understanding that such a sale would be unappealing, largely because of the high monthly rent for the existing premises.  As will be further discussed, the salability was likely also diminished by the fact that the agreements between Plaintiff and Defendant did not include a non-compete or similar provision that would have limited Defendant's ability to solicit the practice's patients after the sale.  In March 2011, Defendant's general attorney referred him to a bankruptcy attorney, with whom he met and had discussions about Defendant filing for personal bankruptcy.

Defendant's general attorney, who had previously represented him in the attempts to negotiate some form of debt relief, then represented Defendant in an attempt to sell Killgrove PC to Stephen E. Jacobson, D.D.S., P.C. ("Jacobson Dental Group"), which was located almost directly across the street from Killgrove PC and whose principal was Dr. Stephen Jacobson. Defendant testified that he and Dr. Jacobson met to negotiate this transaction about five times during 2009 to 2010.  Defendant initially sought a price of $400,000 to $500,000.  Dr. Jacobson, who was also represented by counsel, countered with an offer of approximately half that amount and there ensued some negotiation over the terms of the potential agreement, which around April 2011 evolved to the point of the drafting of an asset purchase agreement, but with an as yet or undetermined purchase price.  However, they failed to reach a final purchase agreement, and instead in May 2011, they began negotiating an arrangement whereby Defendant would become

5

a wage-earning employee of Jacobson Dental Group. It was also then apparent to Defendant that Killgrove PC's premises lease (due to expire on December 31, 2012) was clearly not going to be renewed due to the sizeable rent arrearage, and in late June 2011, Defendant viewed eviction as inevitable. Facing the indicated financial difficulties, on June 30, 2011, Defendant ceased operating Killgrove PC at its then location and vacated the premises, leaving behind only some furniture and equipment. He did not then seek Plaintiff's consent or provide prior notice, but Defendant shortly thereafter informed Plaintiff of the closure through his attorney. At the time Killgrove PC closed, it had roughly 490 patients and had receivables of approximately $18,000, some of which Defendant collected and used to pay payroll taxes and obligations to employees' 401(k) plans. A state court judgment of eviction was entered on or about July 26, 2011. As of the trial, Plaintiff asserts an outstanding loan debt of $339,002.97, plus interest, costs, and attorney's fees. The existence of this debt and Defendant's liability thereon are not contested.

On July 5, 2011 Defendant began working for Jacobson Dental Group, pursuant to an employment agreement signed on an unspecified date in June 2011. The employment agreement was for a two year term and is mutually renewable. As of the trial, neither party to it indicated any intent to terminate the employment contract and Defendant had continued to be employed by Jacobson Dental Group. Defendant's compensation, to an extent, relates to the revenue he brings into Jacobson Dental Group from treating the former patients of Killgrove PC. Patients of Defendant and Killgrove PC, as identified in a list, were to be "referred" to Jacobson Dental Group. It was understood that Defendant would be "bringing" these patients with him on his first day as an employee there. In the event Defendant left Jacobson Dental Group, he would be free to take these patients with him, a privilege apparently not granted to any other dentist

6

employed by Jacobson Dental Group. These patients were integrated into Jacobson Dental Group by way of the delivery of their hard-copy records and the computer server containing their electronic records, as well as their personal information, medical records, and billing records. However, the existing Killgrove PC hard-copy patient files were kept physically separate in the Jacobson Dental Group premises because it did not keep or maintain such documents in hard-copy format, but such hard-copy files were accessible to authorized employees of Jacobson Dental Group. Under the employment arrangement, Defendant was responsible for paying his own malpractice insurance, disability insurance, dental license fee, pharmacy fee, DEA license fee, and continuing education costs.

Testimony indicated that patients who had an existing appointment scheduled for July 5, 2011 at Killgrove PC's office were notified by telephone to come to the office of Jacobson Dental Group, across the street from where they were accustomed to going. Patients received a postcard indicating that Killgrove PC had "joined" Jacobson Dental Group and inviting them to make an appointment at its "new location." Later, patients received a more detailed letter informing them of the office's new location and describing the additional and improved services they could now receive. The phone number that previously rang to Killgrove PC's office was modified to play a recording that informed callers that the office "has moved and had joined" Jacobson Dental Group, and callers were thereafter automatically transferred to Jacobson Dental Group's office. Patients who were formerly treated at Killgrove PC were documented on the Jacobson Dental Group database as having designated Defendant as their preferred dentist. Credible testimony indicated that 80-90% of patients with such a designation were formerly patients of Killgrove PC and the evidence indicated that about 30% of the patients at Jacobson

7

Dental Group were formerly patients of Killgrove PC. Such patients who had completed any patient information forms at Killgrove PC did not have to redo them at Jacobson Dental Group, except as necessary as to bring them up-to-date.

The three employees of Killgrove PC also moved to Jacobson Dental Group, essentially keeping their same positions and bringing from Killgrove PC's office some computer hardware and other items. These employees included the dental assistant/hygienist, office manager, and receptionist. Their testimony, together with that of Defendant, was that (a) they were not forced to move to Jacobson Dental Group, but rather voluntarily took new employment there, and (b) they were notified of this new employment opportunity shortly before the July 5, 2011 date. As of the trial, these employees were still employed by Jacobson Dental Group.

On August 22, 2011, Defendant filed his Chapter 7 bankruptcy, listing on Schedule B a 100% interest in Killgrove PC and further indicating thereafter: "Liabilities exceed assets. No value. Business closed June 2011." Plaintiff repossessed and sold certain furniture and equipment that was left on the vacated premises, recovering some $17,500. Plaintiff did not foreclose or attempt to foreclose on, or to take possession of, the remaining collateral, i.e. the patient list, patient files, phone number, goodwill, and general intangibles (the "Collateral"), though Plaintiff did file a state court action against Defendant and Killgrove PC and obtained a money judgment by default. Plaintiff filed this adversary proceeding and contends that Defendant should be denied discharge pursuant to 11 U.S.C. § 727(a)(2) (transferring, removing, destroying, mutilating, or concealing property of the debtor with intent to hinder, delay, or defraud a creditor); and § 727(a)(4)(a) (making a false oath or account). Plaintiff also contends that the debt Defendant owes it is nondischargeable pursuant to § 523(a)(2)(A) (false pretenses,

8

false representation, or actual fraud); § 523(a)(4) (fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny); and § 523(a)(6) (willful and malicious injury).

Defendant moved for summary judgment. This Court issued a bench opinion, effectuated by an order dated July 3, 2012, denying Defendant's motion almost in its entirety, but eliminating: (a) the § 523(a)(2)(A) claim as it may have related to the balance due on the loan relating to any fraud at time Defendant entered into such agreements, but not with regard to any alleged fraud relating to Defendant closing Killgrove PC and his actions related to the Collateral; and (b) the § 523(a)(4) count as it related to alleged fraud or defalcation while acting in a fiduciary capacity, but not with regard to alleged embezzlement or larceny. This Court denied Defendant's subsequent further motion for partial summary judgment and the matter proceeded to trial.

<h3 style="text-align:center">DISCUSSION</h3>

<em>Plaintiff Holds a Valid Security Interest in the Collateral</em>

As an initial issue, Defendant contests the validity of Plaintiff's purported security interest in the Collateral. Defendant argued that any alleged security interest in Killgrove PC's patient files, as well as any foreclosure and sale of such, is precluded by applicable medical regulations, and is thus void and of no value. Defendant repeatedly testified that he took the patient files to Jacobson Dental Group because he was required to do so by HIPAA and related provisions (or believed in good faith that he was required to do so). Defendant testified he was concerned about malpractice liability for patient abandonment and Michigan's requirement that he retain patient records for at least seven years. See Tierney v. Univ. of Mich. Bd. Of Regents, 257 Mich. App. 681 (2003); Mich. Comp. Laws § 333.20175.

9

Defendant discussed 42 U.S.C. § 17935 and the sections to the Code of Federal Regulations referenced therein. However, such sections indicate that such a transfer is permissible, provided the patient gives a "valid authorization." 42 U.S.C. § 17935(d)(1); see also 45 C.F.R. § 164.508. Similarly, Defendant cites to a memorandum from the U.S. Department of Health and Human Services which states: "Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties *without obtaining authorization from each person on the list.*" *Marketing*, U.S. Dept. Health & Human Serv., Rev. April 3, 2003 (available at *www.hhs.gov/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf*) (emphasis added). Regarding the ethical considerations of such a situation, Defendant's own exhibit clearly states that the American Medical Association considers it ethical for a physician to "forward" patient records to another, although if they are not forwarded, they should be retained and made accessible to the patient. Def. Br. Dkt. 249 Ex. D.

Plaintiff cites to cases where a security interest in, and the subsequent sale of, patient files was recognized as valid, although such cases do not deal with the HIPAA issue. E.g. In re Stephen W. Grosse P.C., 44 B.R. 200 (Bankr. E.D. Pa. 1984) (trustee had standing to file action against dentists for depleting bankruptcy estates by transferring practice assets, including patient lists and files); MATSCO v. Hang, 2010 WL 2681807 (D. Nev. 2010) (creditor alleging security interest on dental records and charts was granted default judgment in part because the court found a "strong likelihood" of success on the merits). Plaintiff's witness testified that Plaintiff had sold a number of Michigan dental practices, including patient lists and files, and without seeking the written approval of the patients before the sale. Plaintiff established that if a dentist

10

refused to voluntarily comply with the sale of the practice, Plaintiff would have a state court receiver appointed to effectuate the sale. The Finance Agreement explicitly provided in Paragraph 19 that Plaintiff may "assign and transfer custody of its patient medical and/or dental files, records, charts and/or lists to a duly licensed medical, dental or other health care practitioner[.]" When Defendant was negotiating a possible sale of Killgrove PC to Dr. Jacobson, their non-finalized draft agreement included provisions stating:

> Upon execution of this Agreement, Killgrove shall…
>
> Transfer to Jacobson all patient lists, patient files, and patient treatment records for the purpose of enabling Jacobson to continue to provide treatment to Killgrove's patients, whether by Timothy as an employee of Jacobson or otherwise. In this regard, all parties agree that:
>
> i) Transfer of patient information is for the purpose of continuing treatment and, therefore, allowed under the HIPAA privacy provisions.

Trial Ex. 70. The record also contains classified advertisements from the Michigan Dental Association listing a number of dental practices for sale, many of which indicated the number of patients involved. One such listing stated "Just want the patient list? Let's talk." Trial Ex. 41.

What can be distilled from these facts and arguments is that, under applicable law and regulations, patients (or the potential to serve such patients if they so desire) can indeed be sold, in a manner of speaking. It appears that Plaintiff could not have legally entered Killgrove PC's premises and repossessed confidential protected patient information, even if it had a contractual right to do so. Regardless, patients could not be forced to unwillingly go to a new provider of Plaintiff's choosing. Ultimately, the choice is the patient's to make. If the patient does not consent to going to the new dentist, the existing dentist must safeguard the patient's records. Thus, in such a sale transaction, what is effectively being sold is the right to approach the patient

11

for the voluntary consent to continue the existing relationship with another dentist. This may have economic value and does not violate the applicable medical regulations that were extensively briefed before this Court. Defendant himself was aware of this, considering that he (a) stated he "purchased the patients" of another dentist; (b) voluntarily granted Plaintiff a security interest in the patient list; (c) unsuccessfully attempted to sell Killgrove PC's patients; and (d) was part of a profession where such transactions regularly occur. Plaintiff held, and continues to hold, a valid and enforceable security interest in the Collateral.

The Court further finds that none of the medical regulations cited by Defendant indicate that he was required to solicit and integrate Killgrove PC's patients into Jacobson Dental Group's practice and to treat them there. The Court is not persuaded by any argument that Defendant believed in good faith that he was required to do so. Defendant's legal duties under HIPAA and related provisions were limited, and could have been satisfied by simply storing the files in a secure area and allowing patients to request and obtain their files. Nor can what happened here be described as the sale of Killgrove PC's dental practice or its patient records and intangibles. Indeed, such a sale had been attempted, but was unsuccessful. The Collateral belonging to Killgrove PC, in which Plaintiff continues to hold a valid security interest, had simply been relocated. In essence, Defendant's situation was such that his apparent best choice was to cease operating Killgrove PC at its then location, become an employee of Jacobson Dental Group, and hope that his former patients might follow him there.

### *11 U.S.C. § 523 (a)(2)(A)*

Under this section, a debtor shall not be discharged from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— false

12

pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]"  Because this statute is phrased in the disjunctive, it contains three separate (albeit nuanced) grounds for nondischargeability.  Rakich v. Jagiello, 2013 WL 4068166, *5, 8 (Bankr. E.D. Mich. 2013) (citations omitted).  "'False pretenses' for purposes of Section 523(a)(2)(A) then may be defined as conscious deceptive or misleading conduct calculated to obtain, or deprive another of, property.  It is the practice of any scam, scheme, subterfuge, artifice, deceit or chicane in the accomplishment of an unlawful objective."  Id. at *14-15 (quoting In re Kovler, 249 B.R. 238, 261 (Bankr. S.D. N.Y. 2000)).  False representation requires proof that:

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

In re Grenier, 458 Fed. Appx. 436, 438 (6th Cir. 2012) (quoting In re Rembert, 141 F.3d 277, 280-81 (6th Cir. 1998)).  Actual fraud, which is broader than misrepresentation, encompasses any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another.  In re Hermoyian, 466 B.R. 348, 379-380 (Bankr. E.D. Mich. 2012) (quoting In re Vitanovich, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001)).

What is before the Court now is essentially whether the Defendant's closing Killgrove PC at its then location and moving himself and the subject Collateral to Jacobson Dental Group constitutes any such conduct.  The Court concludes that, at most, Defendant's conduct amounts to a knowing or intentional breach of contract that does not violate § 523(a)(2)(A), in that if Defendant moved the Collateral in violation of the indicated notification and consent provisions of the Finance Agreement, proof of such is insufficient for Plaintiff to meet its burden and is but

13

a part of the totality of the recited circumstances that the Court must take into account. The evidence precludes a conclusion that Defendant engaged in any scam, scheme, subterfuge, artifice, deceit, or chicane in the accomplishment of an unlawful objective, even by a liberal judicial interpretation of those terms. To hold otherwise would inappropriately make breaches of contract tantamount to nondischargeable fraud. See In re Baker, 139 B.R. 692, 694 (Bankr. N.D. Ohio 1992) ("a mere promise as to future conduct is not sufficient to make a debt nondischargeable, even though there is no excuse for the subsequent breach.") (citations omitted); In re Bice, 139 B.R. 662, 666 (Bankr. N.D. Ohio 1991) ("Mere breach of contract, without more, does not render a consequent debt nondischargeable under Section 523(a)(2)(A). A fraudulent promise under Section 523(a)(2)(A) requires proof that at the time the debtor made the promise, the debtor did not intend to perform as required."); Pioneer Bank & Trust Co. v. Niemiec (In re Niemiec), 60 B.R. 737, 742 (Bankr. N.D. Ill. 1986).

In the first place, there is no evidence that in 2007, when Defendant made the representations and warranties not to move the Collateral, he intended to later breach those contractual obligations. Indeed no such claim is made. There are also legitimate questions as to the fact and materiality of the claimed breach of the warranties that are a basis, or the primary basis, of Plaintiff's claims. One warranty contained in paragraph 8 of the above-quoted Finance Agreement is that the Collateral be kept at the specified location "and in any other location at which [Defendant] maintains a practice." Arguably, if Defendant now maintains a practice at Jacobson Dental Group, the latter remains true. Another warranty is that Defendant "shall promptly notify [Plaintiff] of any change in the location of the Collateral[.]" Unlike the other warranties that require prior written consent, this one does not use the word "prior" but rather

14

uses the operative word "promptly." The facts indicate there was prompt notification, albeit after the fact. The other relevant warranties require prior written consent for the sale, exchange, lease, or other disposition of any interest in the Collateral or permitting of the attachment to it of any lien, security interest, or encumbrance. It is not at all clear that any of such actually has or did occur. The facts are that Defendant unsuccessfully attempted such, incident to his attempts to sell the entire practice to Jacobson Dental Group. The ultimately achieved result of Defendant becoming an employee of Jacobson Dental Group and bringing the Collateral with him does not, in the Court's view, sustain Plaintiff's burden of proving there was a sale, exchange, lease, or other disposition of an interest in the Collateral, nor any attachment to it of any lien, security interest, or encumbrance. By its nature, the Collateral remains the property of Killgrove PC, subject to Plaintiff's security interest, and simply followed Defendant to Jacobson Dental Group, where he resumed his practice. Given that conclusion, the relevant warranty, at least in those respects, was not violated.

That said, however, and irrespective and notwithstanding that conclusion or argument, the preponderance of the evidence established, quite clearly, that both Defendant and Killgrove PC were facing serious, if not overwhelming, financial difficulties. Defendant made several good faith attempts to alleviate these burdens and to salvage his deteriorating business, personal finances, and livelihood. Defendant's last resort was to cease operating Killgrove PC at its then location, begin practicing as an employee of Jacobson Dental Group, and treat any such patients who chose to follow him there. Even if Defendant deliberately and premeditatedly set out to move his practice, have the Collateral accompany him, become an employee of Jacobson Dental Group, and then file bankruptcy to discharge his obligations to Plaintiff, under the totality of the

15

circumstances, such conduct would amount to, at most, a knowing or intentional breach of contract and not a cause of action under § 523(a)(2)(A). Further, Defendant cannot be faulted for using the receivables of Killgrove PC to pay taxes and employees' 401(k) contributions because he had a logical, good faith reason to believe that he was legally obligated to pay these amounts, thus belying any finding of fraud.

### *§ 523(a)(4)*

Under this provision, a debtor shall not be discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." As noted, this count survived summary judgment only with regard to the alleged embezzlement or larceny. A person cannot embezzle property that he or she personally owned (even if subject to another's security interest), rather it must be the entrusted property belonging to another party. In re Stollman, 404 B.R. 244, 272-73 (Bankr. E.D. Mich. 2009); In re Brown, 399 B.R. 44, 47-48 (Bankr. N.D. Ind. 2008); In re Meyers, 2010 WL 5475650, *4-5 (Bankr. M.D. Pa. 2010); In re Sever, 438 B.R. 612, 631 (Bankr. C.D. Ill. 2010). Accordingly, the Collateral was and remains property of Killgrove PC, not of Plaintiff, despite Plaintiff's retention of a security interest in it. Defendant did not, and could not, embezzle such property from Plaintiff. In any event, Plaintiff has not proven that it "entrusted" money or property to Defendant, as is required for an embezzlement action. See In re Algire, 430 B.R. 817 (Bankr. S.D. Ohio 2010) (plaintiff issued business loan to defendant, who personally guaranteed it; however, plaintiff did not "entrust" the money to either the defendant's company or defendant himself).

Similarly, Defendant could not have committed larceny, which is defined as the wrongful fraudulent taking of property from its rightful owner. In re Stollman, 404 B.R. at 271 (quoting

16

<u>Gen. Motors Acceptance Corp. v. Cline</u>, 2008 WL 2740777, *4 (N.D. Ohio 2008)); <u>see</u> <u>In re</u> <u>Brown</u>, 2009 WL 2461241, *6 (Bankr. N.D. Ill. 2009).   Larceny is distinguished from embezzlement in that the former requires that the property be wrongfully taken, while the latter requires that the property be lawfully entrusted.   <u>In re Noblit</u>, 327 B.R. 307, 311 (Bankr. E.D. Mich. 2005).   The Collateral was the lawful property of Killgrove PC, subject to Plaintiff's security interest.   Plaintiff never owned it and could not be the victim of larceny by Defendant.

### *§ 523(a)(6)*

Under this provision, a debtor shall not be discharged from any debt for willful and malicious injury to another.   The terms "willful" and "malicious" are distinct and separate concepts.   <u>In re Martin</u>, 321 B.R. 437, 440 (Bankr. N.D. Ohio 2004).   The injury must have been both willful, not just the act giving rise to injury.   <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61 (1998). The term willful means a deliberate or intentional injury.   <u>Id.</u>;   <u>In re Little</u>, 335 B.R. 376, 383 (Bankr. N.D. Ohio 2005).   To establish that a defendant willfully injured it, a plaintiff must show that the defendant either acted with an actual intent to cause the alleged injury or a belief that the alleged injury was substantially certain to result from his act.   <u>Phillips v. Weissert</u> (<u>In re</u> <u>Phillips</u>), 434 B.R. 475, 483 (B.A.P. 6th Cir. 2010) (citing <u>Markowitz v. Campbell</u> (<u>In re</u> <u>Markowitz</u>), 190 F.3d 455, 463-64 (6th Cir. 1999)).   "The term malicious is defined as conduct taken in conscious disregard of one's duties or without just cause or excuse."   <u>In re Little</u>, 335 B.R. at 383-84 (quoting <u>Wheeler v. Laudani</u>, 783 F.2d 610, 615 (6th Cir. 1986)).

"The remedy afforded by § 523(a)(6) generally applies to torts rather than to contracts.   An intentional breach of contract generally will not give rise to a nondischargeable debt, unless it is accompanied by tortious conduct which results in willful and malicious injury."   <u>In re Rich</u>, 401

17

B.R. 281, 288 (Bankr. S.D. Ohio 2009) (citations omitted). "A debtor's intentional breach of a contract does not prove willful and malicious injury because it proves only the intent to commit the act that caused the injury and not the intent to cause the injury." In re Crownover, 417 B.R. 45, 55 (Bankr. E.D. Tenn. 2009) (citing Barnett v. Rich (In re Rich), 401 B.R. 281 (Bankr. S.D. Ohio 2009)). The Bankruptcy Code allows for the discharge of debts owed for intentional breach of contract that are substantially certain to cause injury, unless the conduct would be deemed a tort under state law. Lockerby v. Sierra, 535 F.3d 1038, 1043 (9th Cir. 2008).

> Historically, injuries resulting from breaches of contract are treated very differently from injuries resulting from torts. In contract law, "[t]he motive for the breach commonly is immaterial in an action on the contract." Globe Refining Co. v. Landa Cotton Oil Co., 190 U.S. 540, 547, 23 S.Ct. 754, 47 L.Ed. 1171 (1903) (Holmes, J.). The concept of "efficient breach" is built into our system of contracts, with the understanding that people will sometimes intentionally break their contracts for no other reason than that it benefits them financially. The definition of intent to injure as the commission of an act "substantially certain" to cause harm was born from tort principles, not contract law principles. Restatement (Second) of Torts, § 8A, cmt. b (1965) ("If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.").
>
> The Supreme Court's reasoning in Geiger also supports this conclusion. 523 U.S. at 62, 118 S.Ct. 974. That the Supreme Court in Geiger assumed that § 523(a)(6) encompassed only intentional torts, not intentional breaches of contract, strongly suggests the Court would not approve of a definition of "tortious conduct" that would include intentional breaches of contract whenever it is substantially certain that the breach will cause injury.
>
> Conflating tortious conduct with intent to injure also conflicts with core principles of bankruptcy law and its underlying legislative scheme. A fundamental policy of bankruptcy law is to "relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) (citation omitted). Expanding the scope of § 523(a)(6) to include contracts that are intentionally breached whenever it is substantially certain that injury will occur would severely circumscribe the ability of debtors to "start afresh."

Id. at 1042.

18

> Thus, a party may intentionally breach a contract with the knowledge that an injury may result, but the nature of the injury is in large part foreseeable and assumed as a part of the risk of doing business. The injury is real, but it is not "malicious" in the sense that it deserves exception from discharge under the Bankruptcy Code. The intentional breach is not of itself conduct covered by section 523(a)(6). A primary purpose of bankruptcy legislation is to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). To hold that a debt incurred as the result of a business judgment constitutes an intentional injury to property within the meaning of section 523(a)(6) would frustrate this purpose.

Matter of Haynes, 19 B.R. 849, 852 (Bankr. E.D. Mich. 1982) (footnotes omitted); see In re West, 446 B.R. 813, 817 (Bankr. N.D. Ohio 2010) ("Since the Supreme Court's decision in Kawaauhau v. Geiger, a breach of contract, even if intentional, will not independently support a finding of nondischargeability as applied to § 523(a)(6).") (citing Lockerby, 535 F.3d at 1042-43).

As previously discussed, Defendant's conduct amounts to, at most, a knowing or intentional breach of contract. Plaintiff's argument that Defendant "tortuously interfered" with the business relationship between Plaintiff and Killgrove PC is unpersuasive because, given the posture of that argument and the totality of the factual circumstances, Defendant's conduct is akin to breach of contract and not a tort. Defendant's conduct here does not give rise to nondischargeability under § 523(a)(6), particularly given the circumstances that: (a) both Defendant and Killgrove PC were suffering extreme financial difficulties; (b) Defendant made numerous good-faith efforts to seek relief prior to resorting to any breach of his contractual obligations; (c) the Court finds that Defendant's conduct was directed toward self-preservation and not toward inflicting injury on Plaintiff; (d) the financial injuries that Plaintiff sustained were in the nature of breach of contract, rather than tort; and (e) Plaintiff still has a valid security interest in the Collateral,

19

although its value may have been affected by what occurred and by the essentially inherent nature of the Collateral.

### *§ 727(a)(2)(A)*

This provision states in relevant part:

> The court shall grant the debtor a discharge, unless… the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed… property of the debtor, within one year before the date of the filing of the petition[.]

Plaintiff brings this count on the grounds that Defendant violated this provision by transferring the Collateral to Jacobson Dental Group without Plaintiff's knowledge or consent. However, this claim fails because § 727(a)(2)(A) states that the subject property must be "property of the debtor." It is clearly established by the evidence that the Collateral was not the property of Defendant individually, but rather, of Killgrove PC. Although Defendant was the sole owner of that corporate entity, he did not have an ownership interest in its specific property. Conflating ownership for these purposes in inappropriate. A shareholder in a corporation has no interest in the property or assets of the corporation. In re Hopkins, 2012 WL 423916, n.2 (Bankr. W.D. Mich. 2012) (quoting Hollins v. Brierfield Coal & Iron Co., 150 U.S. 371, 383 (1893)). The fact that Defendant, as guarantor of Killgrove PC's obligations, has or had an individual contractual commitment to keep the practice and its Collateral at a specified location to notify Plaintiff of any changes in its location, and not to remove it without prior consent, does not perforce make the Collateral the individual property of Defendant. The Collateral itself was, is, and remains property of Killgrove PC.

20

This provision states that "The court shall grant the debtor a discharge, unless… the debtor knowingly and fraudulently, in or in connection with the case… made a false oath or account[.]" Plaintiff argues that Defendant made "a false oath or account" by failing to list on his bankruptcy schedules the assets of Killgrove PC.  As above noted, (a) Defendant listed his 100% ownership interest in Killgrove PC, but not any of its specific assets; and (b) a shareholder in a corporation has no personal ownership interest in its property or assets.  Thus, Defendant had no obligation to list the specific assets of Killgrove PC on his schedules.  See In re Shepard, 2011 WL 1045081, *7 (Bankr. D. Md. 2011).  Plaintiff alleges that Defendant converted assets of Killgrove PC either to himself individually, or to Jacobson Dental Group.  Defendant argued that the assets were, and continue to be, property of Killgrove PC.  The premise of Plaintiff's case, and the posture in which it was presented to this Court, was that Defendant converted the Collateral to Jacobson Dental Group, and not to himself individually.  Notwithstanding Defendant's alleged right to leave Jacobson Dental Group and take some or all of the Collateral with him, Plaintiff does not appear to argue, nor does there appear to be any factual indication, that Defendant transferred any of the Collateral to himself individually, or that he owned such individually as of the date he filed his bankruptcy.  Thus, Plaintiff has no cause of action under this provision.

### Even if Plaintiff's Causes of Action were Meritorious, its Damages would have been Nominal

Though this matter has not proceeded to the determination of damages aspect, given the result of the Court's decision, the Court deems it appropriate to briefly discuss the issue of damages because that issue (a) has been presented in that posture; and (b) is arguably somewhat

21

relevant because the size and enormity of any claimed diminution in the value of the Collateral might very well bear on the elements, such as intent, for instance, or some of the grounds on which Plaintiff seeks relief. Plaintiff argues that Defendant's violations diminished the value of the Collateral and deprived Plaintiff of its rights to sell Killgrove PC as a going-concern. Although Plaintiff still maintains the right to foreclose on all of the Collateral, it has chosen not to, arguing that Defendant greatly devalued it by moving it to Jacobson Dental Group. However, Plaintiff did not enter into a non-compete agreement with Defendant, which raises a significant question as to how valuable the Collateral was. Defendant also argues that Plaintiff failed to mitigate damages by refusing to foreclose on the Collateral. Defendant argues that the reason Plaintiff opted not to foreclose is because Plaintiff knew the lack of a non-compete agreement made the Collateral worthless.

Plaintiff's agent Shannon Hay, who managed Killgrove PC's account, testified that such non-compete agreements for dentists are typically limited to two or three years and a five to ten mile geographic radius. Location is a very important asset for a dental practice, and Killgrove PC had a good location due to its high population density, high traffic, and the community's demographics, including residents' income. Mr. Hay also testified that dental practices in the Metro Detroit area have been sold without a non-compete agreement. However, the record does not indicate what amounts were realized from such sales or whether the selling dentist retained the ability to compete (i.e. if the selling dentist had retired or died, the lack of a non-compete agreement would have no impact). He indicated that a practice can be sold even if the dentist had been evicted from the premises. He testified that nobody would be interested in purchasing the Collateral because Defendant moved it to Jacobson Dental Group and that the most valuable

22

asset of a dental practice is its patient list.  In his opinion, had Defendant simply closed Killgrove PC and taken employment elsewhere, but left the Collateral untouched, the Collateral would be devalued by about 30-40%.  Mr. Hay believed that Defendant's ability to compete would be limited, to some extent, by the Finance Agreement.  Dental practices are typically sold for about 50-70% of their three-year average revenue and can typically be sold within three to six months. Killgrove PC's average revenue for 2008-2010, the last three full years it was operating, is $515,273, as evidenced by its tax returns.

Plaintiff's expert witness Paul Goldman testified that he brokered numerous dental practices, mostly in the Metro Detroit area.  He testified that dental practices typically sell for 55-75% of their average annual revenues.  Mr. Goldman testified that a dental practice is salable even if it is closed and even if it has been evicted from its premises, although such would adversely affect its value.  At the behest of Plaintiff, Mr. Goldman conducted a valuation of Killgrove PC at the time Defendant closed it, reaching the figure of $287,500 (which Defendant contests on a number of grounds).  This valuation assumed that none of the practice's assets would be moved and that Defendant was precluded from competing with the purchaser.  He testified that Defendant moving the Collateral and thereafter competing from across the street devalued the assets "almost down to nothing."  Most notably, he stressed (a) the importance that the departing dentist be restrained from competing with the purchasing dentist because about 40-50% of patients follow their dentist "religiously," while 40-50% will "go to anybody" and (b) that a lack of a non-compete would have a severe impact on the sale.  Mr. Goldman indicated that he would not want to "be involved" in an involuntary sale transaction where the departing dentist was able and willing to compete from a nearby location.

23

Defendant's expert witness Gary Leeman is a CPA and has valued about 20 dental practices. He testified that he never encountered a sale of a dental practice without a non-compete agreement. Responding to a hypothetical question regarding a situation substantially similar to the case at hand, he testified that the value of the collateral would be the net book value of the physical assets, i.e. that the intangible assets would be worthless.

Thus the lack of a non-compete agreement has a substantial impact on the value of the Collateral. While Plaintiff's security interest created a contractual obligation for Defendant to refrain from moving the Collateral in the first place, it does not in any sense substitute for a non-compete agreement in the event the practice was sold to another dentist. All the Finance Agreement requires of Defendant is that (a) he not move the Collateral without Plaintiff's consent; and (b) if he defaults under any contractual obligation, Plaintiff can foreclose and sell the practice. Hypothetically, had Defendant not moved the Collateral and had Plaintiff foreclosed on it and sold it to another dentist, Defendant would have been free to immediately compete and solicit those same patients. Plaintiff has demonstrated no legal or contractual obligation that precludes Defendant from doing so. Because the patient list is the most valuable asset of a dental practice, the lack of a non-compete agreement devalues that Collateral greatly. Defendant had been operating his dental practice in that area since 1996, apparently intends to continue practicing in that area, and apparently had every intent and every right to continue treating the former patients of Killgrove PC. Other factors further diminish the value of the Collateral, namely because Killgrove PC: (a) was a small practice; (b) had a specialty in cosmetic dentistry, which appears to have been in substantial decline due to the poor economy; and (c) was evicted from its premises, which would require a purchasing dentist to find a new

24

nearby location.  Thus, a prospective buyer would be buying a dental practice that, in addition to facing the indicated financial difficulties, would have to face legitimate and unrestrained competition from Defendant, with whom the patients had already built a relationship such that about half would follow Defendant "religiously."  If indeed this would be salable, in the Court's view, it would only be at a nominal price.  Thus, should this case have gotten to the damages phase, Plaintiff would not have been able to make a silk purse out of what euphemistically can be called the sow's ear they actually had, as respects that portion of the Collateral.

In one sense, it could be argued that Defendant's actions had the potential effect of preserving the practice, its attendant goodwill, and the value of the Collateral.  Defendant, by moving himself and such of the patients who wished to continue being his patients to nearby Jacobson Dental Group, maintained a continuity in services and location that likely helped him retain such patients.  The problem for a lender in such situations, is that it is difficult, if not impossible, to separate the practice itself from such collateral and from the professional sole-practitioner who performs the services, particularly in the absence of a non-compete agreement. The worth, and likely the existence of any meaningful value at all, is essentially dependent upon whether and to what extent any patients follow that professional to his or her new location (which in turn depends on the continuity of the practice's location, the nature of the services, the nature of the new relationship, the perceived skill of the professional, the availability and convenience of acceptable substitutes, etc.).  In light of all such circumstances, one must conclude the value of the remaining Collateral was not as great Plaintiff asserts (essentially because of its inherent nature and the lack of a non-compete agreement).  Therefore, this Court is inclined to believe that, even if Plaintiff had a meritorious cause of action for

nondischargeability, it could prove only minimal actual damages, and clearly, under these circumstances, the Court would be disinclined to exercise its discretion to grant Plaintiff's request for treble damages and attorney's fees pursuant to Mich. Comp. Laws § 600.2919a.

## CONCLUSION

The Court finds for Defendant on all counts asserted by Plaintiff and denies Plaintiff's request for relief in its entirety. Plaintiff shall present an appropriate order under the local rules.

.

```
Signed on December 20, 2013
```

```
                              /s/ Walter Shapero
                        Walter Shapero
                        United States Bankruptcy Judge
```

26